KONSTANTINOS HASTOUPIS vs. PETER T. GARGAS, executor.

Suffolk.  November 20, 1979. — January 10, 1980.

Present: BROWN, GREANEY, & DREBEN, JJ.

*Executor and Administrator*, Claim barred by short statute of limitations.
     *Practice, Civil*, Claim barred by short statute of limitations. *Con-*
     *tract*, Implied, To make will. *Damages*, Breach of contract to make
     will.

A plaintiff whose original counsel had misunderstood or misinterpreted
     the salient provisions of G. L. c. 197, § 9, was entitled to relief from
     the statute of limitations period pursuant to c. 197, § 10. [31-34]
In an action in quantum meruit for services rendered to a decedent in reli-
     ance on the decedent's unenforceable promise to leave the plaintiff
     one-half of his estate, the judge correctly applied the evidence pertain-
     ing to the estate's value and his award of damages was warranted by
     the evidence. [34-38]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on December 23, 1974.

Upon transfer to the Superior Court, the case was heard
by *Sahady, J.*, a District Court judge sitting under statutory
authority.

*Charles R. Desmarais (Fisher Abramson* with him) for
the defendant.

*John F. Finnerty (John F. Finnerty, Jr.,* with him) for the
plaintiff.

GREANEY, J. The defendant appeals from a judgment
rendered against him as the personal representative of the
estate of Peter J. Haste (the decedent) and from an order de-
nying his motion for a new trial. Mass.R.Civ.P. 59(a), 365
Mass. 827 (1974). The action was originally brought by a
complaint filed in the Supreme Judicial Court pursuant to
the provisions of G. L. c. 197, § 10, as appearing in

St. 1954, c. 552, § 2,[1] to seek a judgment against Haste's estate on a claim not seasonably prosecuted within the short statute of limitations contained in G. L. c. 197, § 9, as amended through St. 1972, c. 256.[2]  The theory of the underlying action was quantum meruit for services rendered to the decedent in reliance on the decedent's unenforceable promise to leave the plaintiff one-half of his estate.

After remand to the Superior Court[3] (G. L. c. 211, § 4A, as amended through St. 1973, c. 1114, § 46), the case was heard by a judge without a jury and resulted in a judgment for the plaintiff in the amount of $375,000.  On appeal the defendant asserts that the judge (1) erred in ruling that justice and equity required prosecution of the claim and that the plaintiff's tardiness did not amount to culpable neglect; (2) in assessing damages, misapplied the holding in *Green* v. *Richmond*, 369 Mass. 47, 55-61 (1975), which permits the estate's value to be considered by the fact finder as some evidence of the value placed by the decedent on the plaintiff's services; and (3) erred in denying the defendant's motion for a new trial.  We affirm both the judgment and the order denying a new trial.

The record before us contains the findings and rulings of the judge, a transcript of the evidence, and certain exhibits. The judge's subsidiary findings of fact will not be set aside unless clearly erroneous.  Mass.R.Civ.P. 52(a), 365 Mass.

---

[1] "If the supreme judicial court, upon a bill in equity filed by a creditor whose claim has not been prosecuted within the time limited by [G. L. c. 197, § 9], deems that justice and equity require it and that such creditor is not chargeable with culpable neglect in not prosecuting his claim within the time so limited, it may give him judgment for the amount of his claim against the estate of the deceased person, provided forthwith upon the filing of the bill a notice such as provided in section nine has been filed in the proper registry of probate; but such judgment shall not affect any payment or distribution made before the filing of such bill and notice."

[2] This amendment provides that suit on a claim against an estate has to be brought within nine months of the bond date.

[3] The Superior Court possesses concurrent jurisdiction with the Supreme Judicial Court as to actions brought under G. L. c. 197, § 10, by virtue of G. L. c. 213, § 1A.

816 (1974). *Neponset Reservoir Corp.* v. *Bashaw*, 8 Mass. App. Ct. 35, 36 (1979), and cases cited. From those findings, supplemented by portions of the evidence, we draw these facts.

The plaintiff Hastoupis, skilled as a baker and a nurse, immigrated with his wife and young child to Massachusetts from Greece in 1967. Shortly after he arrived he met a relative (whom he referred to as his uncle), the decedent, then in his eighties, an unmarried businessman living in New Bedford, who had immigrated from Greece in the early 1900's and who had acquired considerable wealth in the real estate, insurance, and finance businesses. Within two weeks of their first meeting, the plaintiff and his family moved to New Bedford at the decedent's urging and took up residence in the decedent's home in an attic room above the uncle's apartment. The decedent found the plaintiff employment in a bakery.

The family soon became very close to the decedent. The plaintiff's wife did the bulk of the domestic chores, and the plaintiff worked around the house and performed a variety of maintenance tasks at the decedent's office building in New Bedford on a daily basis without pay. The plaintiff also cared for his uncle as his uncle's health began to deteriorate. In 1968 the decedent informed the plaintiff that he had a great deal of money and began to make general promises to "take care" of the plaintiff in exchange for the plaintiff's services.

In 1968 two events took place which the judge found were crucial to Hastoupis' claim. Hastoupis intended to purchase a bakery in Boston for $2,000 from a man who had had a heart attack. The decedent told him, "Do not buy it because I want you to be with me . . . . I am very satisfied with you and your wife and I have in mind to leave you half of my estate. If you buy the bakery, I will leave you nothing." The plaintiff testified that he relied on that statement and did not acquire the bakery.

In the summer of 1968, while the plaintiff and his wife were visiting the decedent in his summer home, they found

him desperately ill. They nursed him back to health. The decedent had requested the plaintiff, who was afraid of being fired if he did not return to work, to stay and reassured him by saying to him: "I have no one to look after me except you. For this reason, I am saying to you, at this moment, that half of my property, I am bequeathing it to you. I am alone here. I have no one to take care of me. I have a lot of money. If you had not come here, I would have been dead here in this room. Half of it, it will be bequeathed to you and your family. You have nothing to worry about. I am quite pleased with you." Throughout 1969, 1970, and 1971, the decedent had similar conversations with the Hastoupis family, in which he repeated the promises to bequeath one-half of the estate. He would refer to the plaintiff and his wife as "my family" and say, "I thank the Lord with all my heart that God sent you to me to take care of me."

The plaintiff and his family continued to live either with the decedent or close by and to care for him until 1971, when he suffered a stroke and was thereafter confined in hospitals or nursing homes. The plaintiff and his family maintained contacts with the decedent at the hospital and nursing homes during the last eighteen months of his life, and the plaintiff continued to maintain and oversee some of his uncle's real estate.

Other witnesses directly corroborated these facts. They testified that the decedent had informed them in several conversations between 1968 and 1972 that he would take care of the plaintiff in his will. A woman in her eighties, Lillian Enos, found by the judge to be an "unimpeachable" witness, testified that the decedent informed her that he was fortunate to have found the plaintiff and that Hastoupis "will be lucky some day when he gets half of everything I got." There was evidence that the defendant, a nephew of the decedent, was not close to the decedent and that the decedent was somewhat disillusioned with him. The judge substantially adopted the plaintiff's testimony and found that he had refrained from seeking his own fortune in the

bakery business and had stayed with the decedent, ministering to his needs and caring for his property in reliance on the decedent's promise to leave him one-half of his estate.

After Haste's death on September 21, 1972, and newspaper publication of the presentation of his will (which had been executed on May 5, 1950, and amended by a codicil on April 17, 1961), the plaintiff discovered that he had not been provided for in the will. In October, 1972, the plaintiff consulted an attorney whom he engaged to represent him on a claim against the estate. The parties stipulated that this attorney was an experienced member of the bar, with a considerable civil practice, and an attorney on whom the plaintiff could properly rely. The bond in the estate was approved on October 18, 1972. The lawyer failed to file the claim or bring suit against the estate until September 28, 1973, after the expiration of the short statute of limitations. The plaintiff testified that he had visited the attorney's office on several occasions, that he had frequently called to inquire about the progress of his case, and that he had received repeated assurances that his claim would be filed in timely fashion. The lawyer was ill throughout most of the relevant time periods and died on August 28, 1974. On December 23, 1974, the plaintiff, through his present counsel, filed this complaint.

The decedent's gross estate totalled $2,746,106.16. Debts of the estate, including taxes, amounted to $986,757.02, and the will provided for pecuniary legacies in the amount of $125,400. The remainder of the estate (real estate valued at $805,439.81 and approximately $500,000 in personalty) was devised and bequeathed to the defendant herein.

1. *Relief from the limitations period.* The defendant maintains that the plaintiff was chargeable with culpable neglect in relying on his original attorney's expertise or, in the alternative, that his attorney by missing the short statute of limitations was culpably neglectful and that counsel's neglect should be attributed on agency principles to the plaintiff. Neither assertion has merit.

General Laws c. 197, § 10, was inserted by St. 1861, c. 174, § 2, and has been maintained in substantially its

present form for more than 100 years. It is remedial in character, and "[i]ts operation is not limited to cases where the failure to sue seasonably was due to such fraud, accident or mistake as would be a ground for equitable relief if there were no statute." *McMahon* v. *Miller*, 192 Mass. 241, 242 (1906), quoting *Ewing* v. *King*, 169 Mass. 97, 102 (1897). A creditor is entitled to relief under § 10 if he demonstrates that his claim has merit, that equity and justice require that its validity be recognized, and if he establishes that his failure to commence the action within the time prescribed was not due to his carelessness or to any lack of diligence for which he might properly be censured or blamed. *Downey* v. *Union Trust Co.*, 312 Mass. 405, 408-409 (1942), and cases cited. Cases that have considered the statute's application have, on widely varying facts, reached divergent results; their chronicle would not be helpful. The cases are collected and discussed in 1 Newhall, Settlement of Estates § 192 (4th ed. 1958). From all the decisions construing and applying § 10, the predicament of the plaintiff in *Downey* v. *Union Trust Co.*, *supra*, is strikingly similar to Hastoupis' difficulties in this case. In *Downey*, the plaintiff, the holder of a claim against an estate, consulted an experienced and respected member of the bar, advised him of all the facts relative to her claim and requested him to handle the matter for her. The attorney advised her that he would do whatever was necessary to protect her rights and also advised her on several occasions that her interests would be taken care of. On these facts, the Supreme Judicial Court upheld conclusions by a master that the plaintiff was justified in relying on the attorney to protect her rights, that she acted with due diligence, that she was not chargeable with culpable neglect, and that justice and equity required presentation of her claim.

There is no meaningful distinction between the facts in the *Downey* case and the subsidiary facts found by the judge as to the plaintiff's conduct in this case. Indeed, the plaintiff's case is the stronger of the two because of the additional facts that he spoke limited English and that he lacked a

formal education. Moreover, he was not totally conversant with legal rules, and he had received continuous assurances that his claim was being properly handled. We conclude that the judge's ruling that the plaintiff was not culpably neglectful is supported by the subsidiary facts found, which in turn are supported by the evidence, and that the ruling is governed by the holding in the *Downey* decision.

The second prong of the defendant's argument is that the plaintiff's original attorney was culpably neglectful and that his neglect vicariously binds the plaintiff.

Although we accept, as an abstract principle, the fact that clients are frequently bound by their lawyers' mistakes, and that "creditors" can be charged with the result of their lawyers' blameworthy conduct under § 10 (see generally *Sykes* v. *Meacham*, 103 Mass. 285, 287 [1869]; *Leach* v. *Leach*, 238 Mass. 100, 104-105 [1921]; *Haven* v. *Smith*, 250 Mass. 546, 549 [1925]; contrast *Downey* v. *Union Trust Co.*, *supra* at 409), on this point *Downey* is again virtually indistinguishable. If the attorney's failure was "due to inadvertence, misunderstanding, illness or some cause other than neglect or breach of duty" (*id.*), that misstep is not culpable under the statute, nor attributable to the creditor client. The statute thus leaves to the judge some leeway to pardon those errors which arise from a misunderstanding of the controlling law as distinguished from mere procrastination in callous disregard of professional responsibilities. A circumspect review of the evidence supports the judge's conclusions that the plaintiff's original counsel misunderstood or misinterpreted the salient provisions of G. L. c. 197, § 9. The attorney, it appears, always intended to file suit in a timely fashion, knew that a suit against an estate could not be brought for a specified period of time,[4] and recognized that an atypical statute of limitations applied to these claims. The judge could also properly find that the claim had merit

---

[4] General Laws c. 197, § 1, as amended through St. 1969, c. 493, § 1, provides that suits cannot be brought against an estate by a creditor of the deceased until the expiration of three months from the bond date.

as one worthy of judicial consideration. See *Russell* v. *Foley*, 278 Mass. 145, 148 (1932). Furthermore, the age of § 9 (it dates from St. 1788, c. 66, § 3), considered in the light of two fairly radical changes in its limitations period[5] prior to the attorney's receiving the claim could explain his error. Considering that many a well intentioned lawyer has felt the pricks of the statute's brambles, we are satisfied on the facts found by the judge that the plaintiff's original counsel misunderstood or misinterpreted the time limitations in the statute and that his conduct was within the range of ordinary excusable fallibility. *Downey* v. *Union Trust Co.*, 312 Mass. at 408-409. Cases brought to our attention by the defendant are inapposite on their facts. See *Leach* v. *Leach, supra*; *First Portland Natl. Bank* v. *Taylor*, 323 Mass. 492 (1948); *Burke* v. *Gahagan*, 325 Mass. 68 (1949).

2. *Damages.* The defendant argues that the damages awarded are excessive because the judge misapplied the evidence pertaining to the estate's value and awarded damages beyond market standards to compensate the plaintiff for his rendition of intangible social services to the decedent. In disposing of these arguments we think it important to discuss first the concepts that guide the assessment of damages in this type of action and then to take up the judge's application of the principles set forth in *Green* v. *Richmond*, 369 Mass. 47 (1975).

The evidence established that the plaintiff and the decedent had struck an express bargain by which the decedent

---

[5] Statute 1971, c. 548, approved July 21, 1971, amended § 9 to reduce the limitations period for the filing of a claim against an estate from one year to six months from the bond date. This change applied to the estates of decedents dying after January 1, 1972, and in the present case would have required the filing of suit by April 18, 1973. On May 11, 1972, § 9 was again amended by St. 1972, c. 256, to increase the permissible time period for filing suit to nine months. This amendment did not state that it was applicable only to estates of persons dying after a specified date, and as a consequence may have had some retroactive effect. If it did, suit would have been required in this case by July 18, 1973. We express no opinion as to the retroactivity question.

promised to bequeath to the plaintiff one-half of his estate in exchange for the plaintiff's performing services for him until his death. The plaintiff kept his part of the bargain and the decedent breached his. Because the decedent's portion of the agreement amounted to an oral contract to make (or amend) a will, unenforceable by reason of the Statute of Frauds (G. L. c. 259, § 5A), the plaintiff's recovery would be in quantum meruit for the fair and reasonable value of his services as a method of compelling the estate to pay for what the decedent received by virtue of the unenforceable express contract. *Green* v. *Richmond,* 369 Mass. at 49-50, and cases cited. *Rich* v. *DeAvellar,* 2 Mass. App. Ct. 632, 634 (1974), and cases cited.

The measurement of damages for the reasonable value of the plaintiff's services is premised on principles of restitution, that is, the party liable in restitution for monetary damages must pay an amount equal to the benefits that have been conferred upon him. Restatement (Second) of Contracts § 385, Comment a (Tent. Draft No. 14, 1979). The promisee possesses a protected restitutional interest because the promisor (the decedent), who is treated for purposes of the analysis as the contract breaker, has been unjustly enriched. Restatement (Second) of Contracts, *supra* § 358, Comment d.[6] See generally *Douillette* v. *Parmenter,* 335 Mass. 305, 307 (1957), and cases cited. When the un-

---

[6] The Restatement favors the concept of a restitutional recovery in cases where agreements are unenforceable because of the Statute of Frauds. It reserves remedies that protect the promisee's "expectation interest" (i.e., the promisee's interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed) (Restatement [Second] of Contracts, *supra* § 358[a]), and the promisee's "reliance interest" (i.e., the promisee's interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made) (*id.* at § 358[b]) for cases where an enforceable contract has been breached. See Restatement (Second) of Contracts, *supra* § 358, Comment a. A thoughtful argument has been made that a restitutionary recovery in the guise of quantum meruit, in theory and in fact, protects and enforces reliance damages. See Childres & Garamella, The Law of Restitution and the Reliance Interest in Contract, 64 Nw. L. Rev. 433 (1969).

performed promise is to leave a percentage of the estate, reliable evidence of the estate's value becomes some proof of "the reasonable value of the performance that [the decedent] has received." 5 Corbin, Contracts § 1113, at 601 (1964). Such a result pertains because "[t]he question to be determined is not the value of the work considered by itself and unrelated to the contract. The question to be determined is the benefit to the [promisor] in advancement of the ends to be promoted by the contract." *Buccini* v. *Paterno Constr. Co.*, 253 N.Y. 256, 259 (1930) (Cardozo, C.J., commenting on a quantum meruit recovery on an unenforceable contract to render artistic services). See also Perillo, Restitution in a Contractual Context, 73 Colum. L. Rev. 1208, 1215-1219 (1973).

Within this analytical framework, the court in *Green* v. *Richmond* further indicates that claims for quantum meruit against an estate may, where appropriate, include damages for two distinct categories of services rendered to the decedent: first, "services . . . [which are] of such a routine and ordinary nature as to make their fair value a matter of common knowledge for the jury's consideration" (*id.* at 55) (i.e., services for which the plaintiff can recover absent any evidence at all as to value),[7] and secondly, services for which there exists no established value in the marketplace and which cannot be measured by ordinary pecuniary standards (3 Williston, Contracts § 536, at 835 [3d ed. 1960]), such as those of a "social and domestic . . . nature, performed . . . for the decedent over the [period in question]."[8] *Green* v. *Richmond,* 369 Mass. at 49. In determining the value of unique services arising out of a discrete social relationship, the trier must consider all relevant circumstances including "the situation and relationship of the parties as well as the nature and extent of the services

---

[7] Janitorial services for the upkeep of decedent's building would fall into this category.

[8] Services of a quasi filial nature, including staying with the decedent until his death, would fall into this category.

rendered." 3 Williston, Contracts, *supra* at 835 n.6. The trier may also consider the estate's value as "evidence of . . . the 'price' put on the services by one of the contracting parties." *Green* v. *Richmond,* 369 Mass. at 56.

In the instant case, the judge received and considered reliable evidence as to the estate's value in the form of estate and tax documents indicating the size of the gross estate, the amount of taxes, debts and pecuniary legacies, and the size of the residue. The damages awarded included recovery for the plaintiff's practical services in providing nursing care, domestic help, and caretaking for the decedent's real estate. Undoubtedly, the largest part of the judge's award covered services not susceptible of precise pricing in the marketplace, including close to five years of consanguineous companionship and the plaintiff's abandonment of a business opportunity in order to remain with the decedent. In sifting all the facts and weighing all the circumstances that surrounded delivery of the benefits, the judge could, and did, take the evidence as to the estate's value "as an admission against interest, for the purpose of establishing the value of such services." Woodward, The Law of Quasi-Contracts § 104, at 166 (1913). 2 Corbin, Contracts § 328 (1950). That he correctly used that value in settling damages and properly applied the principles in *Green* v. *Richmond* is illustrated to our satisfaction by the excerpt from his memorandum of decision quoted in the margin[9] and by his extensive commentary in the course of hearing the motion for new trial on his methodology for setting damages. In our opinion it would be illogical to permit consideration of the evidence as to the estate's value and, after the controlling damages principles have been correctly applied, to reject the

---

[9] "The Court in assessing damages in this case is, therefore, considering the value of the estate as some evidence in ascertaining the reasonable value of the services rendered by the plaintiff.

"The Court is unable to distinguish this case from *Green* v. *Richmond, supra.* If we are to have the defendant's estate pay for what the testator received by virtue of the express contract, it follows that the value the testator placed on those services should be one element that the trier of fact ought to consider in awarding damages."

award as excessive. The fact that damages are sizeable does not require the award to be rejected out of hand where there is no indication that the estate's value was applied as a *per se* measure. Any undercurrents created by the estate's size which might flow the recovery into impermissibly broad channels can be controlled by prudent adherence to the relevant damages principles. We are satisfied that the judge fully understood that the price fixed by the parties in the agreement was important but not conclusive and that the plaintiff's recovery was designed to represent the value of the benefits received by the decedent. Because the judge's findings as to damages are warranted upon a reasonable view of the evidence they must stand. As the Supreme Judicial Court has aptly observed as to a quantum meruit recovery against an estate: "The ascertainment of the fair market value of services so unusual in nature and so uncommon in ordinary experience is doubtless a matter of some difficulty, but the problem lies primarily in the domain of fact and its solution must to a large extent be left to the good sense, practical wisdom and sound judgment of the trier of fact, mindful of the evidence and guided by the correct principles of law." *Downey* v. *Union Trust Co.*, 312 Mass. at 417, and cases cited.

3. *Other arguments.* We briefly treat and dispose of the defendant's remaining arguments directed at the propriety of the damages.

(a) The fact that the promises made by the decedent were directed in part to the plaintiff's wife, and that she may in turn have supplied some of the services for which damages were awarded, is not a basis for overturning the award. See *Draper* v. *Turner,* 339 Mass. 616, 619 (1959).

(b) The facts that there was no concrete evidence of promises by the decedent to the plaintiff subsequent to 1970 or 1971 [10] and that the estate may have grown in size between 1968 and 1972 does not raise the "interesting issue" men-

---

[10] There was evidence that the decedent informed others in 1972 that the plaintiff was to receive one-half of his estate.

tioned in *Green* v. *Richmond,* 369 Mass. at 58 n.3, as to the date at which the estate's value should be shown (the date of the agreement or the date of death). The judge found that no evidence had been presented that the decedent's estate had increased in value between the time the promises were made and 1972. Based on that lack of evidence and the other evidence before him, the judge could have concluded that there had been no appreciable increase in the estate's size during the relevant time periods.

(c) The fact that the plaintiff may not have known the full extent of the decedent's wealth is not cause for rejecting his claim or reducing the amount of damages.

(d) The defendant's cryptic three sentence assertion that the damages might have been influenced by disclosure to the judge in the course of the trial of the amount discussed as a settlement or by the judge's possible knowledge of the amount of the plaintiff's pretrial demand in the case does not amount to adequate appellate argument on the *point* (Mass.R.A.P. 16[*a*][4], as amended, 367 Mass. 921 [1975]; *Goldstein* v. *Columbia Diamond Ring Co.,* 366 Mass. 835, 843 [1975]), and otherwise receives no support in the record.

*Order denying new trial affirmed.*

*Judgment affirmed.*